## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**NATIONAL INTERSTATE
INSURANCE COMPANY,**
an Ohio insurance company,

       Plaintiff/Counter-Defendant,

   vs.                                                     Civil No.    **01-1446 MCA/WDS**

**PENNY EMERSON**,
a New Mexico resident, *et al.*,

       Defendant/Counter-Plaintiffs.


### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### REGARDING CONTRACT REFORMATION


THIS MATTER came before the Court on a bench trial held from January 26, 2004, through January 28, 2004, [Doc. No. 277] and the parties' trial briefs [Doc. No. 278, 280] and proposed findings and conclusions [Doc. No. 273, 276] regarding the counterclaim for contract reformation.  Having considered the evidence admitted at trial, the oral arguments and written submissions of counsel, the relevant law, and being fully advised in the premises, I find by a preponderance of the evidence that Counter-Plaintiffs Penny Emerson and Native Resource Development, Inc. (NRD) are entitled to reformation of the insurance contract with Counter-Defendant National Interstate Insurance Company (NIIC) to reflect a limit of $1,000,000 in uninsured motorist (UM) coverage.

I.     **FINDINGS OF FACT**

From the evidence admitted at trial, I make the following Findings of Fact.

1.   At all relevant times, Penny Emerson owned a business which provided non-emergency ground medical transportation to clients who lived in the Four Corners area of New Mexico and Arizona, including the Navajo reservation.   Such transport includes doctor's appointments, kidney dialysis and other similar medical needs.

2.   The transport service involves a driver who picks-up a patient from his/her home on the reservation, takes them to the medical appointment and returns them home thereafter.

3.   Ms. Emerson first incorporated her business in 1990 as Native Resources Development (NRD) under the laws of the Navajo Nation.

4.   The corporate status lapsed in 1996.   Native Resources Development was reincorporated in June 2001.

5.   The automobile accident which caused Ms. Emerson's injuries and which is the subject of this case occurred in August 2001.

6.   As a result of an arbitration proceeding, arbitrators found that Ms. Emerson incurred 1.8 million dollars in compensable damages (Exhibit No. 81).

7.   The damage amount resulting from the arbitration proceeding was allowed into evidence for the limited purpose of demonstrating the actual amount of Ms. Emerson's damages in the event that contract reformation would be allowed.

8.   Ms. Emerson actively managed her business from its start in 1990 until her accident on August 11, 2001.

9.  Until late 2000, Ms. Emerson's business was insured by The Hartford Company, including liability and Uninsured (UI) and Under Insured Motorist (UIM) coverages.

10.  In 2000 Ms. Emerson received notice from Hartford that it would not renew her policy later in 2000.

11.  Prior to the expiration of the Hartford policy, Ms. Emerson received a telephone solicitation for sale of insurance from David Krzyzanowski of Mueller and Associates in Phoenix, Arizona.

12.  Ms. Emerson expressed her interest in doing business with Mr. Krzyzanowski and advised Mr. Krzyzanowski on numerous occasions that she wanted "more coverage" than the $1,000,000 in coverage she had with her previous insurer, Hartford.

13.  At no relevant time was Mr. Krzyzanowski licensed in New Mexico.

14.  Ms. Emerson gave Mr. Krzyzanowski a copy of her Hartford policy.

15.  Ms. Emerson relied on Mr. Krzyzanowski to review the Hartford policy and advise her as to the coverage she required.

16.  Ms. Emerson advised Mr. Krzyzanowski that she wanted $5,000,000 in auto liability coverage.

17.  Mr. Krzyzanowski told Ms. Emerson that he would try to get more UM coverage for her.

18.  Mr. Krzyzanowski advised Ms. Emerson that he was shopping the market and would try to find the best coverage for her that would include her request for more insurance.

19.  During a series of early telephone calls Ms. Emerson apprised Mr. Krzyzanowski of the nature of her business, number of vehicles, and requested that he "put a price quote together for me."

20.  On numerous occasions, Ms. Emerson advised Mr. Krzyzanowski that she needed "lots of coverage" because she was in an area where there are a lot of drunk drivers.

21.  Mr. Krzyzanowski routinely makes it a practice to match the amount of UM/UIM coverage to the amount of liability coverage.

22.  On or about October 13, 2000, Ms. Emerson returned to Mr. Krzyzanowski the completed application which Mr. Krzyzanowski had previously faxed to her, including attachments that she had compiled.  [Ex. 5.][1]

23.  The completed insurance application, filled out and signed by Mr. Krzyzanowski on or about October 19, 2000, contains a request for $1,000,000 liability coverage and $1,000,000 in UI/UIM coverage.  [Ex. 6.]

24.  Mueller and Associates forwarded the completed insurance application to the attention of Nancy Terrill at National Interstate Insurance Company (NIIC) on or about October 20, 2000.  [Ex. 7.]

---

[1]The Court notes that the videotaped deposition of Mr. Krzyzanowski was  admitted into evidence but the parties failed to properly cross-reference the numerous documents referenced in Mr. Krzyzanowski's deposition with those admitted as reformation trial exhibits.  The exhibits referenced in this *Memorandum Opinion and Order* are those admitted at trial under the numbering scheme indicated in the Exhibit List attached to the Clerk's Minutes [Doc. No. 277.]

25. Ms. Terrill, and thus NIIC, received and reviewed the application submitted by Mr. Krzyzanowski containing the request for $1,000,000 liability coverage and $1,000,000 UM/UIM coverage. [Ex. 7.]

26. Mr. Krzyzanowski advised Ms. Emerson that he could obtain her needed coverage from NIIC.

27. Mr. Krzyzanowski and Mueller and Associates were familiar with NIIC because they had frequently done business with NIIC for other customers.

28. NIIC is one of Mr. Krzyzanowski and Mueller & Associates' top transportation carriers with whom they do business.

29. NIIC provided no training to Mr. Krzyzanowski or Mueller & Associates concerning New Mexico Uninsured/Under Insured Motorist law.

30. Exhibit No. 10 represents a premium quotation ($67,000) for a $5,000,000 auto liability policy from NIIC first shown to Ms. Emerson by Mr. Krzyzanowski in a face-to-face meeting on December 6, 2000, in Phoenix, Arizona.

31. Ms. Emerson construed Exhibit No. 10 as comporting with her initial request that she obtain more coverage than she had with Hartford.

32. Neither Mueller and Associates nor Mr. Krzyzanowski advised Ms. Emerson of her right to procure UM/UIM coverage in an amount equal to the liability coverage.

33. NIIC did not advise Ms. Emerson of her right to procure UM/UIM coverage in an amount equal to the amount of liability coverage.

34.   On December 7, 2000, the day following a face-to-face meeting with Mr. Krzyzanowski, Mr. Krzyzanowski faxed to Ms. Emerson Exhibit No. 32, the New Mexico UM/UIM form; and upon receipt it was apparent that the quality of the printing was poor and the print was barely legible.

35.   Exhibit No. 32 lists the UM/UIM amount at $60,000.

36.   Exhibit No. 32 was pre-printed with the blank spaces for electing coverage filled in by NIIC.

37.   Ms. Emerson did not sign Exhibit No. 32 until December 7, 2000, the day after the policy was bound and the policy went into effect.  [Ex. 23, 31.]

38.   Ms. Emerson was asked by NIIC, through Mr. Krzyzanowski, to sign another New Mexico UM/UIM form (Exhibit No. 44).

39.   Exhibit No. 44 was signed by Ms. Emerson under threat of cancellation on March 15, 2001.

40.   Exhibit No. 44 was not delivered to Ms. Emerson as part of her policy until May 2001.  The policy delivered to Ms. Emerson in May 2001 also included the completed and signed insurance application containing the request for $1,000,000 in UM coverage.  [Ex. 50.]

41.   Exhibit No. 50 is the policy which Ms. Emerson received along with a cover letter dated May 16, 2001.

42.   At all relevant times, Mr. Krzyzanowski and other various employees of Mueller and Associates acted as intermediaries with respect to the communications between NIIC and

Ms. Emerson, including the transmittal of the two versions of the New Mexico UM/UIM forms (Exhibit Nos. 32 and 44).

43.  Mr. Krzyzanowski never clarified to Ms. Emerson his role as between himself and NIIC.

44.  It was unclear to Ms. Emerson whether Mr. Krzyzanowski was her agent or an agent of the NIIC.  She expressed it by stating "I just didn't know what his role was, was he on my side or on the insurance company's side."

45.  Ms. Emerson was never advised by Mr. Krzyzanowski or anyone at NIIC that she had the option of purchasing UM/UIM limits equal to that of the liability limits.

46.  Mr. Krzyzanowski was a dual agent of Ms. Emerson and NIIC during part of the times that he interacted with them.

47.  At all relevant times, Ms. Emerson understood the term "comprehensive" to mean "encompassing everything."

48.  Ms. Emerson received her NIIC policy in May 2001.

49.  In her job as broker marketing representative, Ms. Terrill represented NIIC to retail agents and brokers and she sold a public auto insurance product.

50.  Mr. Krzyzanowski was know to Ms. Terrill as "a producer."

51.  Ms. Terrill knew Mr. Krzyzanowski through other transactions with Mueller & Associates.

52.  Ms. Terrill testified that from the time she received Ms. Emerson's application to the time that coverage was placed, she conferred with Mr. Krzyzanowski every couple of days.

53.  Mr. Krzyzanowski's commission was paid by NIIC.

54.  Ms. Terrill talked to Mr. Krzyzanowski about "the formatting, the application gathering information" of Ms. Emerson's policy.

55.  At no time was Ms. Terrill instructed by NIIC or any other entity as to Uninsured Motorist or Under Insured Motorist coverage laws or regulations for the State of New Mexico.

56.  Ms. Terrill received no training from NIIC on how to advise either the producer, Mr. Krzyzanowski, or the insured about New Mexico law.

57.  Jason Hradek was NIIC's underwriter who worked Ms. Emerson's account and was aware of Ms. Emerson's application and her request for $1,000,000 UM/UIM coverage. [Ex. 18.]

58.  Ms. Emerson's policy was bound on December 6, 2000.  [Ex. 23, 30.]

59.  Ms. Terrill received and reviewed the completed application containing the request for $1,000,000 UM/UIM coverage as noted on her submission checklist which she submitted to underwriting on November 12, 2000 (Exhibit No. 13).

60.  NIIC provided price quotes for $1,000,000 automobile liability and $5,000,000 automobile liability but only quoted up to $100,000 in UM/UIM coverage.  [Ex. 17, 19, and 20.]

61.   These price quotes were transmitted to Mr. Krzyzanowski and Mueller and Associates on or about November 28 or 29, 2000.  [Ex. 17, 19.]

62.   Ms. Terrill tried to move things along, even with incomplete documents, because she understood that Mr. Krzyzanowski and Ms. Emerson were under time constraints.

63.   Ms. Emerson submitted a check dated December 5, 2000, in the amount of $13,509 to NIIC representing her down payment, and NIIC accepted the payment.  [Ex. 24.]

64.   Except for the UM/UIM forms described above, NIIC did not provide Mueller & Associates or Ms. Emerson with literature or information relating to stacking, UM, or UIM coverage and as that might apply in the State of New Mexico.

65.  Ms. Terrill had no knowledge of and received no training regarding New Mexico UM, or UIM insurance law.

66.   NIIC filled in the amount and checked off the election box on the New Mexico UM/UIM forms but did not complete the New Mexico forms correctly or in accordance with the parties' intentions.

67.   At the time of the insurance sale to Ms. Emerson, Ms. Terrill was neither a resident nor non-resident agent licensed in the state of New Mexico.

## II.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

In their *Answer and Counterclaim*, Ms. Emerson and NRD assert that they are entitled to reformation of the commercial auto insurance policy issued by NIIC so as to provide additional uninsured motorist (UM) benefits in response to Ms. Emerson's accident of August 11, 2001.  I reach the following conclusions of law regarding this counterclaim for

contract reformation based on the preponderance of the evidence that was admitted at trial.

In support of their counterclaim for contract reformation, Ms. Emerson and NRD rely on three theories.[2] The first theory is that there was a mutual mistake concerning the amount of UM coverage and that the insurance contract must be reformed to express the intentions of the parties. The second theory is that if the mistake as to the amount of UM coverage was unilateral on the part of Ms. Emerson or NRD, then the insurance contract should be reformed because that mistake was due to misrepresentation or other inequitable conduct by NIIC. The third theory is that if the evidence is unclear as to what amount of UM coverage the parties intended, then the insurance contract should be reformed to an amount that complies with New Mexico law and public policy regarding UM coverage.

I find that each of these theories has some application to the facts of this case. With respect to the first theory, I find that the parties admitted at trial and in their written submissions that there was a mutual mistake on a portion of the insurance policy at issue here entitled "New Mexico Notice Regarding Uninsured/Underinsured Motorists Coverages." [Ex. 32, 44.] Specifically, this form lists the amount of UM coverage as "$60,000." This figure is mistaken because neither party intended to enter into a contract for this amount of

---

[2]Some of these theories were previously addressed in the *Memorandum Opinion and Order* [Doc. No. 232] filed on January 6, 2004, and clarified in the *Memorandum Opinion and Order* [Doc. No. 261] filed on January 22, 2004. As noted earlier, the Court retains the authority to revise or clarify its opinions granting or denying partial summary judgment prior to the issuance of a final judgment. See FDIC v. Massingill, 24 F.3d 768, 774 (5th Cir. 1994); 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[2], at 56-281 (3d ed. 2003). At this juncture, I base my decision to reform the contract on the theories advanced at trial.

UM coverage.  In addition, the form was preprinted with the blank spaces for electing coverage filled in by NIIC, and Ms. Emerson did not sign the form until after the bind order was submitted and the policy went into effect.  The form she initially signed on December 7, 2000, is a faxed copy containing text that is, for the most part, illegible.  [Ex. 32.]  The original form was signed under threat of cancellation on March 15, 2001 [Ex. 44, 45], and was not delivered as part of the policy until May 2001.  [Ex. 50.]  The $60,000 figure contained in the New Mexico UM/UIM form that was included in the policy in May 2001 conflicts with the request for $1,000,000 in UM/UIM coverage contained in the completed insurance application that was also included in the policy in May 2001.  [Ex. 50.]  Various employees of Mueller and Associates, including Mr. Kzryzanowski, acted as intermediaries with respect to the communications between NIIC and Ms. Emerson, including the transmittal of the New Mexico UM form.  For these reasons, the New Mexico UM form filled out by NIIC and later signed by Ms. Emerson is of limited utility in discerning what amount of UM coverage the parties intended.

The mutual mistake in filling out and signing the New Mexico UM form could provide a basis for contract reformation under equitable principles recognized by New Mexico courts if there were credible evidence showing that the parties shared the same intentions as to the correct amount of coverage.  See Chromo Mountain Ranch P'ship v. Gonzales, 101 N.M. 298, 299, 681 P.2d 724,725 (1984).  New Mexico courts appear to follow the rule expressed in Section 155 of the Restatement (Second) of Contracts (1981), which states that:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will by unfairly affected.

See State ex rel. State Highway & Transp. Dept. v. Garley, 111 N.M. 383, 388, 806 P.2d 32, 37 (1991).

On the facts presented here, however, this rule does not resolve the issue because the parties disagree as to how the mistaken figure on the New Mexico UM form should be corrected, and each party expresses a different view of what their intentions were at the time the contract was formed. NIIC maintains that its employees never intended to sell more than $100,000 of New Mexico UM coverage with this policy, and that the proposal they presented to Mueller and Associates prior to the formation of the contract only provided for this amount. NIIC further asserts that Ms. Emerson's intention to accept NIIC's proposal for $100,000 in New Mexico UM coverage is evinced by the following documents and events: (1) Mueller and Associates' request on her behalf to bind coverage effective December 6, 2000; (2) her signature on the New Mexico UM form on December 7, 2000, and again on March 15, 2001; and (3) her failure to raise any objection to the policy delivered to her in May 2001 until after the accident on August 11, 2001. For these reasons, NIIC claims that the contract cannot be reformed to an amount greater than $100,000 under a theory of mutual mistake.

Ms. Emerson and Mr. Kzryzanowski of Mueller and Associates testified that the insured's intent was to obtain as much coverage as possible on this policy. As evidence of

such intent, they point to the request for $1,000,000 in UM coverage stated on the insurance application submitted on Ms. Emerson's behalf by Mueller and Associates. They also point out that, to the extent NIIC gave Ms. Emerson any choice between higher and lower coverage limits, she always chose the higher limits, and this choice accords with Mr. Kzryzanowski's recommendations. Finally, Ms. Emerson claims that NIIC's proposals and communications did not comply with a provision of New Mexico law under which she was entitled to obtain UM coverage up to the amount of NRD's liability coverage, *i.e.*, $5,000,000.

In order to resolve this dispute, I turn to the second and third theories of contract reformation asserted by Ms. Emerson and NRD at trial. Under the second theory, New Mexico courts have recognized "inequitable conduct" as a potential basis for reforming a contract even in the absence of an express finding of mutual mistake or fraud. See Buck v. Mountain States Investment Corp., 76 N.M. 261, 264-65, 414 P.2d 491, 493-94 (1966); Stock v. Adco General Corp., 96 N.M. 544, 549, 632 P.2d 1182, 1187 (Ct. App. 1981). "It is not essential that the inequitable conduct be some serious wrongdoing." Kimberly, Inc. v. Hays, 88 N.M. 140, 144, 537 P.2d 1402, 1406 (1975). Thus, "[a]n agent's conduct need not be characterized as fraud in order to warrant reformation of an insurance policy." Buck, 76 N.M. at 264, 414 P.2d at 494. Reformation may be warranted where the mistake is induced by an agent's conduct that amounts to "a lack of good faith and fair dealing" or "negligence." Id. at 265, 414 P.2d at 494.

-13-

In this case, I determine by a preponderance of the evidence based on the evidence admitted at trial that Ms. Emerson's mistaken belief with regard to the amount of UM coverage she had purchased, as well as her lack of awareness of what rights were available to her under New Mexico law at the time the contract was formed, were due to inequitable conduct by NIIC. Specifically, NIIC acted inequitably by: (1) delivering an insurance policy to NRD that denied or disregarded the request for $1,000,000 in UM coverage contained on the insurance application, (2) failing to advise Ms. Emerson of her options under New Mexico's UM statute in a timely and complete manner, and (3) relying on employees of Mueller and Associates (such as Mr. Kzryzanowski), who were not licensed insurance agents or brokers in New Mexico, to act as intermediaries with respect to its communications with Ms. Emerson in this regard.[3] While I do not find that the inequitable conduct of NIIC rose

---

[3]My determination that NIIC acted inequitably in this case does not necessarily depend on a finding that NIIC is responsible for any independent conduct of Mueller and Associates' employees, such as Mr. Kzryzanowski, under a theory of *respondeat superior*. However, to the extent that NIIC claims it cannot be held responsible for any communications that Mueller and Associates' employees transmitted on its behalf to Ms. Emerson, I adopt the view of New Mexico agency law expressed in the *Memorandum Opinion and Order* [Doc. No. 232] filed on January 6, 2004. Applying this view of New Mexico agency law, I find that NIIC supplied information concerning UM coverage to Mueller and Associates' employees, and Mueller and Associates' employees were acting as NIIC's agents in transmitting this information to Ms. Emerson. Therefore, NIIC is responsible for such transmittals under a theory of *respondeat superior*. The fact that NIIC elected to use Mueller and Associates' employees as intermediaries, or may have attempted to delegate some of its duties under New Mexico's UM statute to these intermediaries, does not insulate NIIC from liability under the contract-reformation theories pertinent to this case. With respect to the testimony of Ms. Emerson's expert, Garth Allen, I deem NIIC's motion to strike his testimony as moot, as I did not rely on his testimony in reaching my findings and conclusions, and I believe that such were supported by other evidence in this case.

to the level of fraud or deliberate misrepresentation, this conduct nevertheless fell short of the standards required of an insurer under New Mexico's UM statute.

My reliance on the New Mexico UM statute in balancing the equities at issue here also invokes a third theory of contract reformation, under which certain provisions of a contract "may be reformed to bring them within minimum legal standards of fairness," rather than simply to conform to the parties' intentions. 1 Dan B. Dobbs, Dobbs Law of Remedies § 4.3(7), at 619 (1993). Such a theory also may depend on a party's ignorance, rather than a mistaken intention, where the law allocates the risk of such ignorance to the other party. Cf. 2 Dan B. Dobbs, supra § 11.2, at 718-21 (distinguishing mistakes from conscious ignorance and noting circumstances under which risks associated with one party's ignorance may be allocated to the other party). Thus, the possibility that Ms. Emerson was simply unaware, rather than mistaken, with respect to her options under New Mexico law and the contents of the written insurance policy issued to her in this case does not necessarily preclude reformation of the contract under this theory.

New Mexico courts have applied similar theories to reform insurance contracts when necessary to bring them into compliance with insurance statutes that reflect strong public policies regarding uninsured motorist coverage. See, e.g., Montano v. Allstate Indem. Co., 2004-NMSC-020, 135 N.M. 681, 92 P.3d 1255 (stacking); Gov't Employees Ins. Co. v. Welch, 2004-NMSC-014, 135 N.M. 452, 90 P.3d 471 (exclusion of UM coverage in personal umbrella policy); Padilla v. State Farm Mut. Auto. Ins. Co., 2003-NMSC-011, 133 N.M. 661, 68 P.3d 901 ("escape hatch" arbitration provision); State Farm Mut. Auto. Ins.

Co. v. Marquez, 2001-NMCA-053, 130 N.M. 591, 28 P.3d 1132 (territorial restriction on UM coverage); Phoenix Indem. Ins. Co. v. Pulis, 2000-NMSC-023, 129 N.M. 395, 9 P.3d 639 ("named driver" exclusion); Kaiser v. DeCarrera, 1996-NMSC-050, 122 N.M. 221, 923 P.2d 588 (rejection of uninsured/underinsured motorist coverage); Romero v. Dairyland Insurance Co., 111 N.M. 154, 803 P.2d 243 (1990) (same); Stinbrink v. Farmers Ins. Co. of Ariz., 111 N.M. 179, 803 P.2d 664 (1990) (exclusion of punitive damages from UM coverage and splitting of arbitration costs); Padilla v. Dairyland Ins. Co., 109 N.M. 555, 557, 787 P.2d 835, 837 (1990) (exclusion of named insured from UM coverage when accident involved an insured vehicle); Chavez v. State Farm Mut. Auto. Ins. Co., 87 N.M. 327, 533 P.2d 100 (1975) (similar).  Accordingly, my analysis now turns to New Mexico's UM statute, as interpreted by the State's appellate courts.

N.M. Stat. Ann. § 66-5-301(A) provides that:

> No motor vehicle or automobile liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person and for injury to or destruction of property of others arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in New Mexico with respect to any motor vehicle registered or principally garaged in New Mexico unless coverage is provided therein or supplemental thereto in minimum limits for bodily injury or death and for injury to or destruction of property as set forth in Section 66-5-215 NMSA 1978 and such higher limits as may be desired by the insured, but up to the limits of liability specified in bodily injury and property damage liability provisions of the insured's policy, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, and for injury to or destruction of property resulting therefrom, according to the rules and regulations promulgated by, and under provisions filed with and approved by, the superintendent of insurance.

-16-

This statute

> embodies a public policy of New Mexico to make uninsured motorist coverage
> a part of every automobile liability insurance policy issued in this state, with
> certain limited exceptions.  The statute was intended to expand insurance
> coverage and to protect individual members of the public against the  hazard
> of culpable uninsured motorists.

Romero, 111 N.M. at 156, 803 P.2d at 245 (1990); accord Padilla, 2003-NMSC-011, ¶ 9.

In this case, NIIC essentially argues for a construction of New Mexico's UM statute that would permit insurers to deny an insured's request for UM coverage above the statutory minimum amount.  Under this construction, insurers are not required to deliver policies containing UM coverage with "such higher limits as may be desired by the insured, but up to the limits of liability specified in bodily injury and property damage liability provisions of the insured's policy."  N.M. Stat. Ann. § 66-5-301(A).  Rather, the decision to offer additional UM coverage above the statutory minimum would be optional and would depend on the desire of the insurer, rather than the desire of the insured.  As applied to the facts of this case, such a construction of the statute would mean that NIIC was free to decline Ms. Emerson's request for $1,000,000 in UM coverage (or any other amount above the statutory minimum) and instead offer a "take it or leave it" policy with $5,000,000 in liability coverage and only $100,000 in UM coverage.

As applied to the specific facts of this case, I conclude that such a construction of the statute is contrary to the statute's plain language, the intent of the New Mexico Legislature, and the public policies expressed by the State's appellate courts.  I begin with the statute's plain language, which essentially provides that:  "No motor vehicle or automobile liability

policy ... shall be delivered ... unless coverage is provided ... in ... *such higher limits as may be desired by the insured* ... up to the limits of liability specified in bodily injury and property damage liability provisions of the insured's policy ...."   N.M. Stat. Ann. § 66-5-301(A).  The statute does not refer to such limits as may be desired by the *insurer*, and the language referring to "such higher limits as may be desired by the *insured*" would be superfluous and unnecessary if the Legislature only intended to require that insurers deliver the statutory minimum amount of UM coverage.  See Western Investors Life Ins. Co. v. New Mexico Life Ins. Guar. Ass'n (In re Rehabilitation of W. Investors Life Ins. Co.), 100 N.M. 370, 373, 671 P.2d 31, 34 (1983) ("Statutes must be construed so that no part of the statute is rendered surplusage or superfluous.").

The construction of the statute advocated by NIIC also would be contrary to legislative intent.  In enacting this statute, "'the intent of the Legislature was to put an injured insured in the same position he [or she] would have been in had the tortfeasor had liability coverage in an amount equal to the uninsured/underinsured motorist protection purchased for the insured's benefit.'"  Padilla, 2003-NMSC-011, ¶ 17 (quoting Schmick v. State Farm Mut. Auto. Ins. Co., 103 N.M. 216, 219, 704 P.2d 1092, 1095 (1985)).  This "policy of placing the insured in the same position as to the recovery of damages as if the tortfeasor had liability insurance applies *beyond the [statutory] minimum limits* . . . and extends to the full amount of uninsured or underinsured motorist coverage purchased by the insured under Section 66-5-301."  Padilla, 2003-NMSC-011, ¶ 17 (emphasis added).  While the statute does not necessarily require the insured to purchase UM coverage above the statutory

minimum amount, the statute's reference to such a statutory minimum does not "preclude an insured from purchasing additional coverage." Montano, 2004-NMSC-020, ¶ 19. "By requiring insurers to offer UM coverage, the legislature wanted to encourage insureds to purchase such coverage." Id. § 16.

The intent and purpose of this legislation would be thwarted if the statutory language was construed to allow insurers to deliver insurance policies that deny, discourage, or ignore an insured's attempt to purchase higher limits on UM coverage up to the limits of the insured's own liability coverage. In this case, for example, the amount of UM coverage offered by NIIC ($100,000) amounted to only 2% of the policy's liability coverage ($5,000,000). Thus, if insurers were allowed to set their own limits on UM coverage in a "take it or leave it" policy, there could be great disparities between the position an insured might enjoy as a result of liability coverage and the position she faces when an insurer denies a request for comparable UM coverage.

Such a result also would be contrary to the principle under which New Mexico courts "liberally interpret the [uninsured motorist] statute in order to implement its remedial purpose." Romero, 111 N.M. at 156, 803 P.2d at 245 (citation omitted). Under this principle, any "language in the statute that provides for an exception to uninsured coverage should be construed strictly to protect the insured." Id.; accord Kaiser, 1996-NMSC-050, ¶ 7; Marquez, 2001-NMCA-053, ¶ 6.

In this case, I interpret New Mexico's UM statute to mean that NIIC was not at liberty to deliver an insurance policy to Ms. Emerson and NRD that denied or ignored the request

for $1,000,000 in UM coverage contained in her insurance application, absent clear evidence that she had expressly withdrawn this request and desired lesser UM coverage, or that she elected to purchase less than $1,000,000 in liability coverage.  As explained in further detail below, I also determine that the request contained in the insurance application was never withdrawn, as Ms. Emerson desired and requested at least $1,000,000 in UM coverage throughout the negotiations that resulted in the insurance contract at issue here.  In addition, she elected to raise NRD's liability coverage to $5,000,000 and never even considered purchasing less than $1,000,000 in liability coverage.  It follows that the insurance policy that NIIC delivered to Ms. Emerson and NRD through Mr. Kzryzanowski must be reformed to provide UM coverage in the amount of $1,000,000.

This conclusion does not mean that insurers who wish to do business in New Mexico are always required to offer insurance coverage in whatever amount the insured requests on his or her application.  New Mexico courts have recognized the principle that: "An insurer's decision not to contract at all with a given person is allowable, while an insurer's contract entered into with a given person cannot be limited except where permitted by statute or regulation."  Padilla, 109 N.M. at 557, 787 P.2d at 837.  In accordance with this principle, the interpretation of the UM statute that I adopt in this case does not preclude insurers from electing not to contract at all with a given person if they do not wish to assume the obligation of honoring the insured's request for higher UM coverage.  This interpretation also does not necessarily preclude insurers from declining to offer liability coverage beyond a certain limit, or charging a higher premium for additional UM coverage.  Because NIIC elected to collect

a premium and deliver a New Mexico policy to Ms. Emerson and NRD in this case, however, I conclude that New Mexico's UM statute requires NIIC to honor the request for $1,000,000 in UM coverage stated in the insurance application.

I reform the contract to include the $1,000,000 figure stated in the insurance application (rather than the $5,000,000 figure that corresponds to the limits on NRD's liability coverage) because I do not construe New Mexico's UM statute to mean that, by default, the UM coverage in all insurance contracts in New Mexico is automatically set in an amount equal to the insured's liability coverage.[4] Rather, I conclude that once the insurer has properly informed the insured of his or her options under the UM statute, the insured must bear at least some responsibility for requesting an amount higher than the statutory minimum. Thus, assuming that an insurer has properly apprised a prospective insured of the options mandated by the UM statute (*i.e.*, UM coverage equivalent to the statutory minimum, the limits of the insured's own liability coverage, or somewhere in between these amounts), then the statute only requires the insurer to deliver a policy with higher than the statutory minimum UM coverage if the insured conveys a request for such higher UM coverage.

This interpretation accords with the respective burdens placed on the insurer and the insured by the appellate courts of New Mexico and other states. It is clear from these

---

[4]In this respect, I note that New Mexico law may differ from that of other states, such as Arizona, which may specifically require insurers to offer UM coverage equal to the insured's own liability coverage unless the insured requests a lesser amount. Because of such differences in the laws of the respective states, the Arizona UM coverage selection form signed by Ms. Emerson in this case [Ex. 33, 43] does not play a significant role in my analysis.

authorities that insurers bear some responsibility for informing a prospective insured of his or her options under the UM statute and obtaining a clear, written rejection of certain options.  See, e.g., Montano, 2004-NMSC-020, ¶ 19 (rejection of stacking coverage for "Class 1 Insureds"); Kaiser, 1996-NMSC-050, ¶ 6 (rejection of UM coverage in its entirety). The reasoning behind this conclusion is that "before an insured may make an intelligent decision about how much UM coverage he [or she] wants, or make a knowing waiver of UM coverage in writing (which the agent must obtain if there is to be no UM coverage under the policy), [the insured] must understand what he [or she] is entitled to." Aetna Casualty and Surety Co. v. Berry, 669 So. 2d 56, 76 (Miss. 1996).  This responsibility of advising a prospective insured of his or her UM coverage options falls squarely on the insurer, regardless of whatever additional duties may be attributed to brokers, producers, or other individuals assisting the insured in his or her purchase.   See generally Bernier v. Transamerica Ins. Co., 574 N.E.2d 873, 877 (Ill. App. Ct. 1991) (discussing respective duties of an insurer and an independent insurance broker).

On the other hand, the insurer's burden of providing information about the availability of UM coverage and documenting the insured's choice does not necessarily mean that insurers must also explain the significance of the particular option selected by the insured, see Vigil v. Rio Grande Ins. of Santa Fe, 1997-NMCA-124, ¶ 10, 124 N.M. 324, 950 P.2d 297, " recommend that the insured exercise the option of obtaining UM coverage up to the limits of the policy," Berry, 669 So. 2d at 76, or simply accept as a matter of law that all insurance policies include the maximum amount of UM coverage available, see Montano,

-22-

2004-NMSC-020, ¶ 9.  Once informed of the available options in a timely and complete

manner, the insured bears some responsibility for making a choice and informing the insurer

of this choice.

In order to determine whether reformation of an insurance contract is warranted in this

context, the Court must balance the equities and determine the extent to which each party has

met its respective burdens regarding the availability and choice of UM coverage options.  In

this case, I determine that Ms. Emerson and NRD met their burden of requesting higher UM

coverage in the amount of $1,000,000, and to the extent that NIIC elected to collect a

premium and deliver a policy to Ms. Emerson and NRD, this request was sufficient to trigger

the requirements of New Mexico's UM statute.   I further determine that the employees of

Mueller and Associates also met this burden insofar as they were acting on behalf of Ms.

Emerson and NRD when they initially conveyed this request for $1,000,000 in UM coverage

to NIIC in the insurance application.[5]

NIIC asserts that it should not be held responsible for providing the requested

$1,000,000 in UM coverage in this instance because Ms. Emerson was given a proposal and

later signed a New Mexico UM election form reflecting a lesser amount.  I do not agree that

Ms. Emerson's signature on the New Mexico UM election form or her failure to object to

---

[5]I offer no opinion as to whether Mr. Kzryzanowski or Mueller and Associates  otherwise fulfilled their duties to Ms. Emerson or NRD on those occasions in which they were acting on her behalf because neither Mr. Kzryzanowski nor Mueller and Associates are parties to this action.  See Bernier, 574 N.E.2d at 877-78.  Insofar as the burden of complying with New Mexico's UM statute falls on NIIC, and NIIC is the only Counter-Defendant in this case, the conduct of Mr. Kzryzanowski and other employees of Mueller and Associates is not central to my analysis.

the amount listed in the policy subsequently delivered to her provide sufficient grounds for concluding that she withdrew her request for greater UM coverage or that NIIC should be excused from the requirement of honoring her earlier request under these circumstances.  As noted in my findings above, NIIC acted inequitably and did not fulfill its duties in a timely and complete manner with respect to advising Ms. Emerson of the UM coverage options available under New Mexico law.  Thus, the New Mexico UM form containing an erroneous figure that was signed by Ms. Emerson after the effective date of the policy and under threat of cancellation does not provide reliable evidence of her intent to withdraw her earlier request for higher UM coverage.

My conclusion in this regard does not mean that all forms of the type signed by Ms. Emerson are invalid and cannot be used to document an insured's choice of UM coverage. In the ordinary case, a timely and complete written rejection of UM coverage, or higher UM limits, should be sufficient to defend insurers against the claims of an insured who, with the benefit of 20/20 hindsight, seeks to avoid the consequences of his or her choice of coverage. See, e.g., Montano, 2004-NMSC-020, ¶ 19; Vigil, 1997-NMCA-124, ¶ 10.  Ms. Emerson's case, however, is extraordinary because the evidence presented at trial clearly and convincingly shows that she in fact desired higher UM coverage at the time the contract was formed and, through Mr. Kzryzanowski, she communicated her desire for at least $1,000,000 in UM coverage to the insurer in a manner sufficient to trigger the requirements of New Mexico's UM statute.  For all of the above reasons, the insurance contract between NIIC and NRD must be reformed to include $1,000,000 in UM coverage.

Ms. Emerson and NRD also seek to reform the contract, and obtain additional UM coverage, on two alternative grounds. They first claim that the contract should be reformed to reflect $5,000,000 in UM coverage because the policy contains a limit of $5,000,000 in liability coverage. They also claim, in the alternative, that there was a mistake in defining Ms. Emerson as a "Class 2 Insured" who is not entitled to stack the coverage on more than one vehicle under the policy issued by NIIC. I briefly discuss why these two alternative theories are not viable and do not provide legally sufficient grounds for reforming the contract to an amount greater than $1,000,000.

As noted above, I do not interpret New Mexico's UM statute to require, by default, that all UM coverage be automatically set at the limit of the insured's own liability coverage. In addition, I determine that Ms. Emerson and NRD did not meet their burden of proving that a request for $5,000,000 in UM coverage was ever conveyed to NIIC during the formation of the contract. The record is not entirely clear as to the negotiations or discussions that resulted in the liability coverage being raised from the limit of $1,000,000 requested in the insurance application to the limit of $5,000,000 listed in the policy. While I do not doubt that Ms. Emerson sincerely desired as much coverage as possible, I find it inequitable to reform the UM coverage to an amount greater than $1,000,000 in this case absent more definitive evidence that a specific request for greater UM coverage was conveyed to NIIC during the formation of the contract.

In the *Memorandum Opinion and Order* [Doc. No. 226] filed on December 18, 2003, I previously concluded that Ms. Emerson is not entitled to stacking of UM coverage in this

case because she  falls under the policy's definition of a "Class 2 Insured," and the policy does not provide for stacking of UM coverage for a "Class 2 Insured."  In the subsequent *Memorandum Opinion and Order* [Doc. No. 232] filed on January 6, 2004, I deferred ruling on the merits of Ms. Emerson's alternative claim that she might be able to stack UM coverage under a contract-reformation theory.  After considering the evidence at trial, however, I now conclude that the contract-reformation theory does not provide a basis for stacking UM coverage for the benefit of Ms. Emerson in this case.

While it is conceivable that an insurer might agree to issue a commercial auto policy with a definition of "Class 1 Insured" that specifically includes both a corporation and the individual who owns it, I find no provision of New Mexico law that requires insurers to offer or advise an insured of this possibility.  On the contrary, New Mexico law recognizes the distinction between a "Class 1 Insured" and a "Class 2 Insured" for purposes of stacking, see Ponder v. State Farm Mut. Auto. Ins. Co., 2000-NMSC-033 ¶ 22, 129 N.M. 698, 12 P.3d 960, and allows an insurer to deny stacking to an individual traveling in the vehicle of a corporate insured when that individual is designated as a "Class 2 Insured" under the policy, see Jaramillo v. Providence Washington Ins. Co., 117 N.M. 337, 341-44, 871 P.2d 1343, 1347-50 (1994); cf. Lopez v.  Foundation Reserve Ins. Co., 98 N.M. 166, 172, 646 P.2d 1230, 1236 (1982) (holding that Class 2 insured's coverage is limited to the coverage purchased on the vehicle in which he was riding).  I do not view the New Mexico Supreme Court's recent holding in Montano, 2004-NMSC-020, ¶ 19, as changing that result with respect to "Class 2 Insureds."  Thus, unlike the UM coverage limit discussed above, the

contractual provisions regarding stacking need not be reformed in order to comply with New Mexico law.

I also find no credible evidence that Ms. Emerson or Mr. Kzryzanowski ever conveyed to NIIC a request that Ms. Emerson be designated as a "Class 1 Insured" so that she could stack UM coverage in this case, or that NIIC acted inequitably in failing to consider or advise Ms. Emerson of any options that might have placed her under the policy's definition of a "Class 1 Insured" or otherwise allowed her to stack UM coverage in this instance.  Thus, unlike the UM coverage limits discussed above, there is no basis for concluding that the contractual provisions regarding stacking need to be reformed in order to correct a unilateral mistake induced by the insurer's inequitable conduct.

Finally, there was no credible evidence of a mutual mistake with respect to the stacking of UM coverage for the benefit of Ms. Emerson in this case.  Ignorance of a fact or a legal proposition is not equivalent to a mistake, see 2 Dan B. Dobbs, supra, § 11.2, at 718, and in this case I find no basis for concluding that New Mexico law requires insurers to bear the risk of a business owner's ignorance about whether he or she is a "Class 2 Insured" (or the effect of this definition on stacking), see id. at 719-20; Jaramillo, 117 N.M. at 341-44, 871 P.2d at 1347-50.  For these reasons, the reformation of the contract is limited to the amount of $1,000,000, which corresponds to the amount of UM coverage requested in the insurance application submitted on Ms. Emerson's behalf by Mr. Kzryzanowski of Mueller and Associates.

As there remain other counterclaims to be tried in this case, I will not enter judgment in Ms. Emerson's favor on the contract-reformation counterclaim at this time. Instead, I will convene a status conference with the parties to discuss how this matter should proceed on the remaining counterclaims before any final judgment is entered.

**SO ORDERED** this 16th day of March, 2005, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
UNITED STATES DISTRICT JUDGE